Dɪᴍᴀs Mᴇᴅɪɴᴀs, Appellant, v MILT Hᴏʟᴅɪɴɢs LLC et al., Defendants, and Tʜᴇ Eʟᴇᴠᴀᴛᴏʀ Mᴀɴ, Iɴᴄ., Respondent. (And a Third-Party Action.)

First Department, July 9, 2015

### APPEARANCES OF COUNSEL

*Rosenberg, Minc, Falkoff & Wolff, LLP*, New York City (*Jesse Minc* of counsel), for appellant.

*Gallo Vitucci Klar LLP*, New York City (*Kimberly A. Ricciardi* and *Stephen A. Denberg* of counsel), for respondent.

### OPINION OF THE COURT

SAXE, J.

On September 18, 2010, while employed as an attendant in a parking garage, plaintiff was injured when the freight elevator he was using to transport a vehicle suddenly descended in free fall for three stories before hitting the ground. The parking garage was located in a building owned by defendant MILT Holdings LLC (MILT); it was managed by defendant 2009 Venture Group LLC and a related entity. 2009 Venture Group had entered into a maintenance agreement with defendant The Elevator Man, Inc. in October 2009, but it is undisputed that their maintenance agreement was terminated in March 2010 for nonpayment; after that, The Elevator Man agreed to respond to emergency calls only, for a specified sum, which it did.

Plaintiff sued the building owner, the building lessee, the garage's managing agent and its related entities and subsidiaries, as well as The Elevator Man. The current appeal concerns only the grant of The Elevator Man's motion for summary judgment dismissing plaintiff's direct claim against it.

In its motion for summary judgment, The Elevator Man argued that: (i) the maintenance agreement had been terminated approximately six months prior to the incident and thus it did not owe plaintiff, a nonparty to the contract, any legal duty on the date of loss; (ii) plaintiff could not establish a prima facie case of negligence, as there was no evidence that The Elevator Man created or had actual or constructive notice of any alleged defective condition; and (iii) the doctrine of res ipsa loquitur, relied upon by plaintiff, was inapplicable to the case. The documents it relied on included the deposition testimony of plaintiff and elevator mechanic Slawomir Gwazdacz, an affidavit by its acting president with annexed exhibits, and an expert affidavit of engineer Jon B. Halpern.

In his deposition testimony plaintiff stated that, at the time of the accident, he had been employed as an attendant at the

parking garage for 18 years. The freight elevator served to bring vehicles to the various levels of the garage and could only hold one vehicle at a time, but was large enough to hold an SUV. As a general practice, plaintiff would drive the vehicle onto the elevator, turn off the ignition, get out of the vehicle, and close the elevator doors so that he could manually operate the elevator. On the date of the accident, plaintiff was working the overnight shift, and the accident occurred around midnight. Immediately prior to the accident he drove a Ford Expedition onto the elevator, even though it was over the weight limit, because he had been told to do so by his superiors. In order for the elevator to ascend, he had to hold the elevator button down. As he was holding the button, the elevator began to ascend to the second floor and, upon arrival on the second floor, started rapidly to descend, coming to a full stop at the basement level of the garage, causing an "explosion." Plaintiff also said a coworker informed him on the date of the accident that a mechanic had been performing work on the elevator the day before.

Slawomir Gwazdacz testified that he had been employed as an elevator mechanic by The Elevator Man for the past 12 years, and was familiar with the parking facility at issue, as he had performed maintenance and repairs on the elevator on several occasions while the maintenance agreement was in effect. Gwazdacz said he responded to an emergency call from the premises shortly after the accident occurred on September 18, 2010. He checked on the equipment and to see if the brakes were sliding, explaining that the building had been overloading the elevator "nonstop" prior to the incident, but when he checked on the brakes they were fine. He also observed that the cables were properly on the sheave, but that a crack in the sheave went all the way through the center of the wheel, which caused the brakes that connected to the center of the sheave to be ineffective. He had never seen a condition like that before.

Gwazdacz stated that on May 26, 2010, about four months prior to the date of the accident, he had responded to an emergency call from the same premises related to the elevator, and its bearing equipment in particular, in response to a request to "[t]roubleshoot for [a] piercing screech" coming from the machine pedestal bearing. Replacement of the bearings causing this noise was recommended, but it was not done and the elevator was not taken out of service. He testified that he flushed out and greased the bearings. The work ticket from this May 26, 2010 visit reflected:

"Responded to call of elevator making noise."

"Found machine pedestal bearing screeching."

"Lubricated bearing as needed and checked elevator for proper working operation."

"Left elevator in service."

Upon reviewing the work tickets and visits to the premises, Gwazdacz testified that any issue with the bearing component, which he had observed during his May 2010 visit, would not have caused a crack in the elevator sheave, which he asserted was the cause of the accident. He further explained that based upon the fact that the bearing component was located on a different part of the elevator equipment, any issue with the bearing component would not have had an effect on the sheave. He stated that the bearing condition had no relationship with the crack observed following the incident.

Engineer Jon B. Halpern asserted that the accident occurred because the weld between the main drive hub and the main drive shaft had failed due to fatigue, a condition that The Elevator Man had neither created nor had notice of, and had no duty to correct. Halpern further asserted that The Elevator Man was not negligent in its performance of maintenance and repairs while the elevator was under contract, and did not have notice of any defect.

In opposition, plaintiff points out that on January 14, 2010, pursuant to the then-extant maintenance agreement, The Elevator Man performed the annual and five-year inspections on the elevator as mandated by the New York City Department of Buildings, and concluded that the elevator passed inspection. It offers documentary evidence establishing that at the time of that inspection, the elevator in question was subject to a "cease use" citation issued November 1, 2009, under which the New York City Department of Buildings had ordered that use of the elevator cease until certain violations were resolved. That citation remained in force until it was resolved on October 18, 2012.

Plaintiff's expert witness, Patrick Carrajat, stated that in his opinion the chain of events that resulted in the accident began at least as early as May 26, 2010, with The Elevator Man's negligent inspection, which caused vibrations that ultimately caused the sheave to crack and spin uncontrollably, permitting

the elevator to plummet. He noted that the freight elevator, which was installed in 1921, had received an "Unsatisfactory" rating on annual inspections in 2004 through 2008, that no inspection was done in 2009, and that although the inspection performed by The Elevator Man on January 14, 2010 deemed the elevator "Satisfactory," a "Cease Use" violation had been issued on November 1, 2009, which had required that the elevator be removed from service until all violating conditions had been corrected and a reinspection performed. However, the violation was not corrected until October 2012.

Carrajat asserted that the opinions of defendants' expert, Halpern, concerning the cause of the accident, were unsupported by the evidence, and that The Elevator Man's failure to remove the elevator from service after recognizing that it needed immediate replacement was a competent producing cause of the accident and a departure from standard industry practice. It was his further opinion that merely flushing out and greasing the bearings, as The Elevator Man had done in May 2010, was an improper repair that did not address an unreasonable and foreseeable risk of elevator free fall. The work ticket from the May 2010 visit had recommended that the elevator needed a "bearing replacement ASAP," and no action was taken in response. According to Carrajat:

> "the accident of September 18, 2010 was caused by long standing neglect of underlying maintenance issues of the subject elevator, and that the elevator dating back to May, 2010 requiring [sic] bearing replacement at that time. The lubrication of the bearings in May, 2010 was an improper repair and/or remedy and left the elevator in a dangerous condition. It is also my opinion that as of May 26, 2010, the bearings were damaged as evidenced by the noises heard by [Gwazdacz], and the bad bearings created more stress on the drive hub and the mechanical parts that ultimately failed and cracked."

Further, he said that the failure to shut the elevator down at this point "could have and did lead to stress cracks and metal failure and left the subject elevator at risk for catastrophic failure."

Discussion

If the issue were limited to whether The Elevator Man was negligent, a question of fact would preclude summary judgment. However, the issue is not that simple.

"Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party" (*Espinal v Melville Snow Contrs.*, 98 NY2d 136, 138 [2002]). Where a contractor has entered into a contract to render services, it may only be held to have assumed a duty of care to nonparties to the contract in three situations:

> "(1) where the contracting party, in failing to exercise reasonable care in the performance of his duties, 'launche[s] a force or instrument of harm'; (2) where the plaintiff detrimentally relies on the continued performance of the contracting party's duties and (3) where the contracting party has entirely displaced the other party's duty to maintain the premises safely" (*Espinal*, 98 NY2d at 140 [citations omitted]).

To the extent plaintiff relies on the inspection performed by The Elevator Man on January 14, 2010 in which it gave the elevator a "Satisfactory" rating, despite a "Cease Use" violation that had been issued on November 1, 2009, The Elevator Man was subject to the maintenance contract then in effect. To the extent plaintiff argues that The Elevator Man was negligent in the work it performed on May 26, 2010, any duty The Elevator Man had toward him could not be based on the terminated 2009 maintenance agreement; nevertheless, The Elevator Man continued to be subject to a more limited contract with the manager of the parking facility, in which it agreed to respond to emergency calls, upon payment of an agreed fee.

We find the rule set forth in *Espinal* to apply here. It is conceded that of the three possibilities listed in *Espinal*, only the first could provide a basis for liability to plaintiff: "where the contracting party, in failing to exercise reasonable care in the performance of his duties, 'launche[s] a force or instrument of harm'" (*id.* at 140). However, even accepting for purposes of this analysis that The Elevator Man negligently inspected the elevator on January 14, 2010 and negligently failed to correctly assess the condition of the elevator and necessary repair on May 26, 2010, it cannot be said to have launched a force or instrument of harm. That is, in failing to correctly inspect or repair the elevator, it did not create or exacerbate an unsafe condition.

A useful example of the application of this rule is found in *Stiver v Good & Fair Carting & Moving, Inc.* (9 NY3d 253

[2007]). There, the plaintiff, who had been injured in an automobile accident, brought a claim against the mechanic who, two months before the accident, had inspected the other vehicle in the collision, which had caused his accident by becoming disabled in the road; the plaintiff argued that the collision was caused by the mechanic's negligent inspection of that other vehicle. The Court affirmed the dismissal of the claim against the mechanic, observing that "[i]nspecting the car did not create or exacerbate a dangerous condition" (*id.* at 257, citing *Espinal*). The motion court in *Stiver* had relied on a 1998 Third Department decision holding that " 'an inspector's duties under the Vehicle and Traffic Law . . . extend to third parties as it is reasonably foreseeable that someone other than [the] owner may be injured in an accident because of a defect in a motor vehicle' " (*id.* at 256, quoting *Wood v Neff*, 250 AD2d 225, 227 [3d Dept 1998]). The Court of Appeals explained that *Wood* had been handed down before its issuance of *Espinal*.

We reject plaintiff's suggestion that an issue of fact is presented as to whether The Elevator Man launched a force of harm by the work its employee performed on the elevator on May 26, 2010. Although plaintiff's expert, Patrick Carrajat, implies that greasing the bearings on that date created a dangerous condition, his statement recognizes that the bearings were already "bad" at that time. He fails to explain how the act of greasing them increased the risk or made the elevator's condition any *more* dangerous.

Plaintiff also cites a decision of this Court holding that "even in the absence of a contract, an elevator company can be liable in tort, where it negligently services and/or inspects an elevator" (*Casey v New York El. & Elec. Corp.*, 82 AD3d 639, 640 [1st Dept 2011], citing *Alejandro v Marks Woodworking Mach. Co.*, 40 AD2d 770 [1st Dept 1972], *affd* 33 NY2d 856 [1973] and *Alsaydi v GSL Enters.*, 238 AD2d 533 [2d Dept 1997]). The ruling in *Casey* relied on earlier cases that held that

> "[i]t is well settled that an elevator maintenance company owes a duty of care to members of the public, and may be liable for failing to correct conditions of which it is aware, or failing to use reasonable care to 'discover and correct a condition which it ought to have found' " (*Alsaydi*, 238 AD2d at 534, quoting *Rogers v Dorchester Assoc.*, 32 NY2d 553, 559 [1973]).

However, in view of *Espinal*, which post-dated the authorities on which *Casey* relied, although it predated *Casey* itself, we

are unwilling to apply the rule recited in *Casey* to the extent it allows a claim of negligent repair or inspection against an elevator repair contractor by a nonparty to its contract in the absence of a showing that by the work it performed, it "launched a force of harm" by creating or exacerbating an unsafe condition. We perceive no evidence that could create a triable issue as to whether The Elevator Man, in its inspection or its work, "created or exacerbated a dangerous condition" (*Espinal*, 98 NY2d at 142; *Stiver* at 257). Rather, plaintiff's expert essentially asserts that The Elevator Man failed to diagnose and correct an allegedly dangerous condition.

Finally, res ipsa is not applicable to this case, because plaintiff is unable to establish the necessary element of "exclusive control" (*see Hodges v Royal Realty Corp.*, 42 AD3d 350, 352 [1st Dept 2007]).

Accordingly, the order of the Supreme Court, New York County (Louis B. York, J.), entered July 22, 2014, which granted the motion of defendant The Elevator Man, Inc. for summary judgment dismissing the complaint as against it, should be affirmed, without costs.

MAZZARELLI, J.P., SWEENY, ANDRIAS and RICHTER, JJ., concur.

Order, Supreme Court, New York County (Louis B. York, J.), entered July 22, 2014, affirmed, without costs.